UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:05CV-181-H

RUSSELL S. KING                                                                       PLAINTIFF

V.

ZIRMED, INC.,
ROBERT E. ROBBINS, and
C. STRATTON WARDEN                                                        DEFENDANTS

**MEMORANDUM OPINION**

Plaintiff brought suit against Defendants alleging they had deprived him of 6.25 million shares of ZirMed, Inc. stock, of which he was the legally valid owner. Defendants counterclaimed, alleging various statutory and common law violations by Plaintiff that, among other things, foreclosed him from claiming entitlement to the 6.25 million shares. Both sides have moved for summary judgment on a number of the claims made by and against them. For the reasons that follow, the Court will deny each of the motions in their entirety.

I.

In October of 2000, Plaintiff Russell King, a citizen of the United Kingdom, began work as an executive at ZirMed, Inc. ("ZirMed"), in Louisville, Kentucky, pursuant to a three-year employment agreement that among other things allowed for his compensation to be accrued as an unpaid obligation of ZirMed rather than paid out to him, should the company's financial situation require. Upon beginning employment, Plaintiff also entered into a stock option

agreement, under which he would be granted three million options if certain profitability levels were reached. The stock option agreement expired in October of 2003. In January of 2001, Plaintiff was granted another one million options.

In May of 2001, Plaintiff became President and CEO of ZirMed, at which point the prior CEO's four million options were transferred to Plaintiff, and any company-performance-based conditions were removed from the options, such that they vested immediately. All eight million of Plaintiff's options at that time expired in October of 2003. Plaintiff ultimately returned five million of his options to ZirMed in April 2003, and allowed his remaining options to expire in October 2003.

In January of 2004, Plaintiff and ZirMed entered into a new employment agreement as well as two new stock option agreements. In the first stock option agreement Plaintiff received the right to purchase 250,000 shares of ZirMed stock. In the second stock option agreement, Plaintiff received the right to purchase six million shares of ZirMed stock. On January 27, 2004, Plaintiff attempted to exercise all 6.25 million of these options. As consideration, Plaintiff requested cancellation of $62,500 of accrued payment owed by ZirMed. On January 29, 2004, ZirMed issued a stock certificate to Plaintiff evidencing his ownership of 6.25 million shares.

In June of 2004, Plaintiff was denied reentry into the United States following a personal trip abroad. It was determined that despite having first come to the United States in 1990, having been married for eight years to a United States citizen, having received a valid Social Security card, and having received conditional permanent resident status and an alien registration card, Plaintiff had failed to file the requisite documents to remove his "conditional" status. Therefore Plaintiff effectively had been in the United States illegally prior to his departure on the

trip from which he was returning, and was now ineligible to reenter the United States. Plaintiff endeavored to continue in his role as CEO of ZirMed, setting up operations in Toronto and continuing to participate in company management. He also applied for a visa that would allow him to return to Louisville.

On October 11, 2004, ZirMed's board of directors voted to terminate Plaintiff's employment with the company, invoking the "for cause" provision of his employment agreement. New management was retained, and in January 2004, that new management acted to confiscate Plaintiff's 6.25 million shares, cancelling them on the company's books and noting that they were improperly granted.

Plaintiff filed his complaint in March of 2005, alleging (as amended) numerous counts relating to Defendants' allegedly improper confiscation of his shares. Defendants filed their Answer in May of 2005, which included a multi-count counterclaim against Plaintiff. Currently pending before the Court are three summary judgment motions: Defendants' motion for summary judgment on the entirety of Plaintiff's complaint, Defendants' motion for partial summary judgment on its counterclaim, and Plaintiff's motion for partial summary judgment on his complaint.

II.

Summary judgment is proper if the evidence submitted shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) . In applying Rule 56(c) , a court views the evidence in a light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A court properly enters summary

judgment where there is not sufficient evidence in support of the non-movant's case upon which "a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

At bottom, the questions before the Court come down to whether Plaintiff is the valid legal owner of 6.25 million shares of ZirMed stock (or of stock option agreements entitling him to purchase the same). The various claims made by and against each side in their respective summary judgment motions are calculated to argue either that some impediment exists to Plaintiff's ownership of the shares, or that no such impediment exists. As the Court sees it, this dispute breaks down into four key questions. First, were the stock option agreements for 6.25 million shares valid? Second, if so, did Plaintiff validly exercise the options? Third, was Plaintiff validly terminated by ZirMed, and if so, did that termination affect his ownership of ZirMed stock or his entitlement to the options contracts? Fourth, are any and all agreements between Plaintiff and ZirMed void due to the fact that Plaintiff was an illegal immigrant at the time of his employment by ZirMed? The Court will consider each question in turn.

### III.

The question of whether Plaintiff's stock option agreements were valid can be divided into two separate inquiries. ZirMed's board of directors must have properly authorized the agreements, and the agreements, once authorized, must then meet the legal requirements of a contract.

Sitting in diversity, this Court must determine which state's law to apply to these questions, and does so using the choice of law provisions of the state in which it sits. *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000). Kentucky courts give "controlling effect to the law of the jurisdiction which, because of its relationship or contact with

the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation," *Breeding v. Mass. Indem. & Life Ins. Co.*, 633 S.W.2d 717, 719 (Ky. 1982), sometimes referred to as the "most significant relationship" test. Here, ZirMed is a Delaware corporation, so the Court will apply Delaware law. *Cf. Churchill Downs, Inc. v. ODS Techs., Inc.*, 2007 WL 1231550 at *3 (W.D. Ky. April 25, 2007).

A.

Under Delaware law, every corporation not prohibited from doing so by its certificate of incorporation is allowed to create and issue shares of stock of the corporation and options "entitling the holders thereof to acquire from the corporation any shares" of the corporation's stock. Del. C. tit. 8, § 157(a). The shares need not be granted at market value, *see, e.g., Leung v. Schuler*, 2000 WL 1478538 (Del. Ch. October 2, 2000), but must be granted pursuant to an act of the board, which under Delaware law occurs upon the vote of a majority of the directors present at a meeting at which a majority of all directors is present. Del. C. tit. 8, § 141.

An act of the board that meets these criteria may still be invalid if it is tainted by one or more directors' self interest. But a contract between a corporation and one of its directors is not *per se* impermissible, and may be deemed proper either if the material facts regarding the director's interest are disclosed to the board and the contract is authorized by a majority of disinterested directors, or if the contract is deemed fair to the corporation at the time the board approves it (sometimes referred to as "entire fairness" analysis). Del. C. tit. 8, § 144.

Here, the ZirMed board at the relevant time consisted of Plaintiff, Godfrey King, and Douglas Fielding. Plaintiff appears to have voted in favor of the 6-million-share grant, but to have recused himself from voting on the 250,000-share grant. Godfrey King, as Plaintiff's

father, might have been impermissibly "interested" in the contract, and Defendants also allege that the disinterestedness of Douglas Fielding, as a ZirMed employee (and therefore someone who would report to Plaintiff), would be questionable. However, it also appears that the board's acts were not entirely *sui generis*, but rather were informed to some degree by the report of the Shareholder Compensation Committee. Plaintiff's interest in the transaction was obvious to the board. Furthermore, whether a substantial grant of shares to Plaintiff could be deemed "fair" to the corporation, is by no means clear. For example, on the one hand, Plaintiff apparently presided over a significant turnaround in ZirMed's financial condition, yet he received an amount of shares that would significantly dilute current shareholders' ownership interests. At this time, the facts regarding the board's disinterestedness or lack thereof, as well as the degree to which the options agreements were "fair" to the corporation when granted are simply too insufficiently developed to make summary judgment appropriate.

B.

The question of whether, if properly granted, the options contracts met the legal requirements for a valid contract is more easily answered. The key question is whether sufficient consideration was exchanged. But the Delaware Supreme Court has noted that in the absence of actual fraud a board has broad discretion under 8 Del. C. § 157 as to the determination of what will constitute sufficient consideration. *See, e.g., Pogostin v. Rice*, 480 A.2d 619, 625 (Del. 1984) (internal citations omitted), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Here, the ZirMed board explicitly stated that the grant of 250,000 options was "to reflect the substantial changes made by [Plaintiff] to the company's financial position over the years

6

2001 to 2003 inclusive." Such consideration has been found sufficient by both Delaware and federal courts. *See, e.g., Haft v. Dart Group Corp.*, 841 F. Supp. 549, 575 (D. Del. 1993) (citing Del. C. tit. 8, § 122(5)); *Zupnick v. Goizueta*, 698 A.2d 384, 388 (Del. Ch. 1997). Though no such explicit statement appeared regarding the grant of 6 million options, evidence suggests that Plaintiff may have foregone exercising his then-outstanding options in 2003 in expectation of the grant he ultimately received. Therefore, it is at least likely that the options contracts met the legal requirements for a valid contract.

IV.

The question of whether Plaintiff properly and validly exercised his options is also more straightforwardly answered. The terms of his 2004 stock option agreements stated that in order to exercise them, Plaintiff must provide written notice of his desire to do so to ZirMed's principal office, sent to the attention of the company secretary, and to include full payment of the option price (here, $0.01/share) plus any applicable taxes and withholding. Plaintiff sent a "Dear Sirs" letter to ZirMed's Louisville offices, where ZirMed's corporate secretary, Mike McCaulley, received it. In his letter, Plaintiff requested that in exchange for issuing him the 6.25 million shares, ZirMed cancel $62,500 of Plaintiff's then-accrued pay. McCaulley subsequently issued a stock certificate to Plaintiff indicating Plaintiff was the owner of 6.25 million shares of ZirMed stock.

While it is permissible for a cancellation of indebtedness to qualify as payment for shares, *Blish v. Thompson Automatic Arms Corp.*, 64 A.2d 581, 598 (Del. 1948) ("the fact that the amount claimed is unliquidated is of no real import. Such a transaction is equivalent to the payment of cash by the creditor to the corporation for the stock."), it is unclear whether Plaintiff

7

fulfilled his obligation by paying only the strike price of the shares and no more.  But provided no further amounts were owed upon exercise of the shares (an allegation raised but not conclusively demonstrated by Defendants), Plaintiff appears to have complied with the terms of his stock option agreements.

V.

Next the Court considers whether Plaintiff was properly terminated by ZirMed, and if so, whether that termination should have or did have an impact on Plaintiff's ownership of his purportedly exercised shares.  As noted above, Plaintiff's 2004 employment agreement provided that ZirMed could terminate him for cause immediately upon written notice.  However, if the asserted "cause" was Plaintiff's failure to perform his duties as required by his employment agreement, Plaintiff was entitled to have received written notice of the alleged failure and an opportunity to cure it before being terminated.  If the asserted "cause" was instead a failure to obey the reasonable and lawful directions of the ZirMed board, however, no such notice or opportunity to cure was required.

Defendants assert that by being unable to enter the United States for approximately four months prior to his termination, Plaintiff failed to "perform his duties primarily at ZirMed's principal executive offices located in Louisville, Kentucky," and to "perform his duties hereunder to the best of his ability and at a level of competency consistent with the position occupied," as required by his employment agreement.  Furthermore, Defendants assert that by not attending the October 11, 2004 board meeting in person, Plaintiff failed to obey a reasonable and lawful direction of the ZirMed board.  As might be expected in the context of such ambiguous terms as "to the best of his ability" or "a level of competency consistent with the

8

position occupied" or "primarily" in Louisville, significant issues of fact surround each of these allegations, making summary judgment as to the propriety of Plaintiff's termination inappropriate.

Yet even if ZirMed's termination of Plaintiff's employment was proper, the Court has been unable to find any provision in Plaintiff's employment agreement, his options agreements, the ZirMed certificate of incorporation, or the ZirMed bylaws indicating that upon termination, any ZirMed shares owned by Plaintiff would be subject to confiscation, cancellation, or other invalidation. Thus while the question of the propriety of Plaintiff's termination certainly will be relevant from a breach-of-employment-contract perspective, it does not seem to be a factor in answering the question of whether Plaintiff is the legally valid owner of the 6.25 million shares, pursuant to the two separately executed agreements.

## VI.

Finally, the Court will consider Defendants' assertion that as a threshold matter, any and all agreements into which Plaintiff might have entered with ZirMed are void or voidable due to the fact that Plaintiff was an illegal immigrant.

This breathtakingly broad public-policy-based argument relies on the Immigration Control and Reform Act of 1986, 8 U.S.C. § 1324 ("IRCA"), which makes it illegal for an employer to employ an illegal immigrant, and for illegal immigrants to "subvert the employer verification system by tendering fraudulent documents." *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 148 (2002). Defendants argue that *Hoffman*, which denied an administrative award of back pay for the period after an illegal alien (who had procured employment using fraudulent documents) had been fired on the grounds that such an award

9

would violate IRCA, should be interpreted as promulgating a broad rule that illegal alien employees have no ability to enforce the terms of contracts into which they have entered with their employers.

This expansive reading of *Hoffman*, which would deprive illegal immigrant employees of such things as basic rights to contracts, has been rejected by courts considering circumstances not directly analogous to those in *Hoffman, see, e.g., Flores v. Amigon*, 233 F.Supp.2d 462 (E.D.N.Y. 2002) (rejecting application of *Hoffman* in the context of an illegal immigrant's action to recover unpaid wages), and would effectively require this Court to wholly deprive illegal immigrants of the ability to enter any and all enforceable contracts, whether those contracts were directly related to their illegal immigration or not. This is a step the Court is unwilling to take, as it flies in the face of 42 U.S.C. § 1981, which grants "all persons within the jurisdiction of the United States" the "same right...to make and enforce contracts." *Cf. Martinez v. Fox Valley Bus Lines*, 17 F. Supp. 576, 577 (D. Ill. 1936) (rejecting the idea that "if an alien...is unlawfully in the United States he may be despoiled of his property, contracts with him may be breached...[and] he is without [civil] redress").

Unlike in *Hoffman*, here Plaintiff provided no fraudulent documents to ZirMed in order to procure employment. Indeed, there are at best significant factual ambiguities as to whether he himself was aware of his status as an illegal immigrant until he was denied reentry into the United States in June 2004, whether ZirMed ever inquired about Plaintiff's immigration status before or during his employment, and whether and how Plaintiff ever disclosed anything about his immigration status to ZirMed. The facts before the Supreme Court in *Hoffman* were simply not those presented here, and thus *Hoffman* does not dictate the sweeping conclusion urged upon

10

the Court by Defendants.

Furthermore, the options agreements can hardly be said to be "so connected with an illegal purpose as to be inseparable from it," *Zeitz v. Foley*, 264 S.W.2d 267, 268 (Ky. 1954), since where courts have found such inseparability, the violation of law is a "direct object" of the contract, and the argument of illegality is something more than a "pretext" invoked by a party to "escape [its] obligations." *Id.* Though IRCA unquestionably makes illegal the employment of illegal immigrants and expresses a public policy against such employment, the logical leap between this proposition and the idea that no contract entered into by an illegal immigrant is enforceable by that illegal immigrant is not dictated by *Hoffman*, is contradicted by the United States Code, and will not be accepted by this Court as a way of dispensing with this case.

## VII.

As noted above, at the core of this case is the question of whether Plaintiff is the valid owner of the 6.25 million shares of ZirMed stock seemingly evidenced by his stock certificate issued in 2004. The parties have levied a variety of charges at one another, on some of which they now seek summary judgment. As the Court has discussed, the unresolved factual issues pertaining to the basic issues in the case, and thereby to the claims each party has filed against the other, are such that granting summary judgment at this stage on any of the claims would be premature.

11

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record